# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CINDY S. C.,[1]                          )
                                         )
            Plaintiff,                   )
                                         )          **CIVIL ACTION**
v.                                       )
                                         )          **No. 18-1307-JWL**
ANDREW M. SAUL,[2]                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )
_____  )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security

denying Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)

benefits pursuant to sections 216(i), 223, 1602, and 1614(a) of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381a, and 1382c(a) (hereinafter the Act).  Finding no error in the

Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be

entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the

Commissioner's final decision.

_____

[1] The court makes all its "Memorandum and Order[s]" available online.  Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.
[2] On June 17, 2019, Andrew M. Saul was sworn in as Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant.  In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

# I.    Background

Plaintiff claims the ALJ failed "to provide sufficient reasons for discounting the opinions of the consultative examiner, Dr. Jason Wells." (Pl. Br. 7).

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). "Substantial evidence" refers to the weight of the evidence. It requires more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)). Nonetheless,

the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). This assessment is used at both step four and step five of the sequential evaluation process. Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the

burden is on Plaintiff to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

## II. Discussion

Plaintiff claims "the ALJ afforded little weight to most of the functional limitations contained in Dr. Wells's opinions and significant weight to the aspects of the opinions suggesting that [Plaintiff] was capable of performing simple work." (Pl. Br. 7-8) (citing R. 74). She argues the ALJ discounted Dr. Wells's opinions because of "Dr. Wells's normal mental status examinations, [Plaintiff]'s minimal mental health treatment, lack of suicidal ideation, and reports that [Plaintiff]'s last anxiety attack had occurred two months earlier." Id. at 8 (citing R. 73-74). She argues these reasons are insufficient. Id. (citing Youngblood v. Astrue, No. 08-2607-KHV-GBC, 2009 WL 4611459, at *7 (D. Kan. Dec. 4, 2009)).

Plaintiff argues that Dr. Wells's first examination findings were far from being normal, and "showed limitations consistent with his opinion," such as fair eye contact, relating in a guarded fashion, difficulty focusing, slow speed, inability to recall current events, and appearing uncomfortable during the examination. Id. at 10-11. She argues the ALJ did not address these findings. She argues that the second examination was not normal either, and that "her condition appeared to deteriorate in some ways." (Pl. Br.

4

11).  She notes that she maintained poor eye contact, related in guarded manner, spoke

softly, her speed was slow and deliberate, had difficulty spelling "world" backward,

seemed distracted, recalled only one of three words, was unable to recall current events,

appeared tired and depressed, and the interview appeared to be taxing her.  She argues

that this case is similar to the case of Bryant v. Comm'r, 753 F. App'x 637, 641 (10th

Cir. Nov. 23, 2018), wherein the ALJ impermissibly cherry-picked the record relying "on

portions of medical reports that tended to support a finding of non-disability and

therefore contradicted [the consultative examiner's] opinion, but [] ignor[ing] other

portions of the same reports that confirmed some of [the consultative examiner's]

observations and tended to support her conclusions."  She argues that the ALJ here

committed the same error when he "pointed to Dr. Wells's observations that supported a

finding of non-disability while ignoring the findings in the same report that supported the

opinion."  (Pl. Br. 12).  She argues that in the same manner, the ALJ "cherry-picked the

remaining treatment record in concluding that Dr. Wells's opinion was inconsistent with

the other evidence."  Id. at 13.  She argues that "the ALJ termed the other mental status

examinations as nearly normal-to-normal, [but] failed to support this assessment."  Id.

Plaintiff seems to admit that the record supports the ALJ's findings that Dr.

Wells's opinions are inconsistent with Plaintiff's "minimal mental health treatment, lack

of suicidal ideation, and reports that her last 'bout' of anxiety had been two months

before the examination," but argues "that Dr. Wells considered each of these factors

when assessing [Plaintiff]'s functioning."  Id. at 13-14 (citing this court's opinion in

Fuller v. Astrue, 766 F. Supp. 2d 1149, 1162 (D. Kan. 2011), and implying that the ALJ

in this case also "substituted his medical judgment for that of the medical source when the record made clear that the ALJ specifically considered the claimant's pain behaviors when formulating their opinions."). She argues that "the ALJ pointed to nothing to suggest that a claimant needs to be suicidal to suffer disabling limitations," and that Dr. Wells did not base his opinion on suicidal ideation and noted that Plaintiff had not been suicidal since 2015 but nonetheless opined Plaintiff suffered disabling limitations. (Pl. Brief 14). She argues that she did not report her last 'bout' of anxiety was two months earlier, but "reported that she had panic attacks once a month and that her anxiety impacted her daily." Id. Finally, Plaintiff claims the ALJ erred in relying on Plaintiff's minimal mental health treatment because he failed to apply the analysis required by the regulations and explained by the Tenth Circuit in Frey v. Bowen, 816 F.2d 508, 517 (10th Circuit 1987) (the Frey test). Id. (citing Fuller, 766 F. Supp. 2d at 1166; and Luna v. Colvin, 13-1289-JWL, 2014 WL 5598248 at *5 (D. Kan. Nov. 4, 2014)).

The Commissioner argues that the ALJ properly weighed Dr. Wells's medical opinions and properly assessed Plaintiff's RFC. He points out that the ALJ provided a detailed analysis of the "limited medical evidence," consisting of over 15 single-spaced pages in his decision. (Comm'r Br. 4). He points out that the ALJ weighed all four medical opinions in the record, according partial weight to the medical opinions of both state agency psychological consultants and partial weight to both of Dr. Wells's opinions. Id. at 4-5. He points to record evidence tending to support the ALJ's weighing of the medical opinions. Id. at 5-6.

The Commissioner argues that although the ALJ discounted portions of Dr. Wells's opinions, he "assessed a very restrictive residual functional capacity assessment limiting Plaintiff to performing only simple, repetitive tasks and having only occasional contact with coworkers and supervisors and no contact with the public." (Comm'r Br. 6). He argues that Plaintiff supports her claim of "cherry-picking" with citations to "her own statements rather than objective medical findings." Id. at 7. He argues, "the ALJ did not err in carefully stating which portions of Dr. Wells's opinions he accepted and which portions he rejected, and giving good reasons for rejecting some portions of the opinions." Id. (citing R. 73-75).

The Commissioner argues that the Frey test is inapposite here because the ALJ was considering Plaintiff's unwillingness to seek treatment rather than her inability to secure treatment. Id. at 7-8. He argues that "the ALJ gave a number or [sic] reasons, supported by the record, for rejecting some portions of Dr. Wells's opinions, and Plaintiff's arguments to the contrary should be rejected." Id. at 8 (citing Allman v. Colvin, 813 F.3d 1326, 1333 (10th Cir. 2016).

Plaintiff reiterates her arguments in her Reply Brief. She also argues that the Commissioner's Brief did not address the significant abnormal findings in Dr. Wells's examinations or the evidence supporting his opinions, and that the Commissioner did not address Bryant, but cited to an opinion which addressed an issue not present here.

## A.    Standard for Weighing Medical Opinions

For claims filed before March 17, 2017, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments

about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."[3]  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, where a treating source opinion is not given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.  Id. §§ 404.1527(c), 416.927(c); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2018).  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. §§ 404.1527(c)(2-6), 416.927(c)(2-6).

Opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record.  Robinson v.

_____

[3]The regulations define three types of "acceptable medical sources:"

"Treating source:" an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:" an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:" an "acceptable medical source" who has not examined the claimant but provides a medical opinion.  Id.

Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).  After considering the factors, the ALJ must give reasons in the decision for the weight he gives the medical source opinions.

### B.      The ALJ's Evaluation

At step two of the sequential evaluation process the ALJ found that Plaintiff has severe mental impairments of major depressive disorder, generalized anxiety disorder, and panic disorder.  (R. 55).  At step three he determined that Plaintiff's impairments do not meet or medically equal the severity of any listed impairment.  Id. at 56.  In his step three analysis, the ALJ considered and discussed the relevant record evidence including both medical reports of Dr. Wells and the medical opinions of the state agency psychological consultants, Dr. Cohen and Dr. Duclos, and found that Plaintiff's mental impairments result in moderate limitations in three of the broad mental functional areas; understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace.  (R. 57-58).  He found that Plaintiff has only mild limitations in the fourth broad mental functional area—adapting or managing oneself.  Id. at 58.  He specifically found that his step three finding was supported in part by Dr. Cohen's and Dr. Duclos's opinions (formed when applying the Commissioner's psychiatric review technique) that the claimant had no more than moderate limitations in various mental functional domains."  Id. at 58 (citing Exs. 3A, 4A, 7A, 8A).

As suggested in the Commissioner's Brief, the ALJ discussed his RFC assessment over approximately the next 16 pages of his decision. (R. 59-76). Therein, the ALJ summarized the record evidence including Plaintiff's allegations of symptoms, the medical records, and the opinion evidence. The ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent, and [are] at times inconsistent, with the medical evidence and other evidence in the record." Id. at 61.

The ALJ specifically discussed Dr. Wells's reports of his examinations in March 2016 and in September 2016, and summarized Plaintiff's reporting to Dr. Wells. Id. at 63-64. He provided a particularly extensive and detailed summary of Plaintiff's mental health treatment at The Guidance Center from October 2016 through November 2017. (R. 64-68). He provided considerable discussion regarding the consistency/inconsistency of Plaintiff's allegations. Id. 68-70.

Finally, the ALJ discussed the opinions of the state agency psychological consultants and both opinions of Dr. Wells and explained his weighing of those opinions. (R. 71-75). He accorded partial weight to each of these opinions and explained the portions of these opinions to which he accorded lesser weight. Id.

The court finds it particularly instructive to include the ALJ's entire evaluation of Dr. Wells's first report:

> On March 17, 2016, consultative examiner Jason R. Wells PsyD, diagnosed the claimant with major depressive disorder, recurrent, severe (current); generalized anxiety disorder; and panic disorder. It appeared these diagnoses were largely based on the claimant's self-report of symptoms, as the record indicated the claimant's last "bout" of anxiety or panic attack

had occurred about 2 months earlier. Dr. Wells' opinion was much more limiting than the medical treatment record would generally indicate, especially in light of the claimant [sic] decision not to engage in therapy or undergo a neurological evaluation to determine whether the claimant had short-term memory loss or the extent of memory loss. The only three portions of his opinion related to functional limitations that are well-supported by the record as a whole were that the claimant's overall level of intellectual functioning was estimated to be in the low average range and that she was expected to be able to understand and apply instructions and carry out work-related tasks in the workplace consistent with her level of intellectual functioning; she has the requisite intellectual capacity, judgment, and calculation skills to effectively manage her own funds; and she was best suited for repetitive tasks. However, the remainder of his opinion was more limiting than suggested in the medical treatment records, the minimal mental health treatment the claimant accepted, that she did not report a significant symptom of suicidal ideation since December 2015, and her last "bout" of anxiety or panic attack had occurred about two months earlier. The undersigned acknowledges that symptoms and signs of depression and anxiety may fluctuate within a matter of days, if not minutes or hours. However, the medical treatment evidence in record [sic] generally did not support Dr. Wells' opinion that the claimant's attention, concentration, and memory functioning were so significantly impaired by symptoms of depression, anxiety, and panic attacks that her ability to sustain focus to perform simple tasks during a normal workday was only fair; the speed of her work would be slower than average for a person of the claimant's age; she would respond poorly to work pressure at that time; she would have difficulty in a job that required frequent contact with the public; and her current mental health symptoms were a barrier to effective interaction within the workplace and with the public. Mostly, the medical treatment records showed her mental status examinations were nearly normal-to-normal and contrary to Dr. Wells' opinion that the claimant was significantly limited, his own mental status examination was normal except that her mood was depressed. Otherwise, Dr. Wells observed the claimant's speech was clear, coherent, and of normal rate and tone. There was no indication of any pressured speech. She was logical and goal directed in her verbalizations. There was no indication of any thought disorder present. There were no behavioral manifestations of hallucinations nor any observable indications of delusional thinking. The claimant had no difficulty explaining her thoughts and finding words. The claimant was oriented to person, place, time, and reason for the interview. She was able to discuss the referral question and the assessment she was taking part in. She voiced an understanding that she was applying for benefits. (Exhibit 8F). Therefore, although Dr. Wells was an acceptable medical source and

mental health specialist, his opinion was not generally consistent with the record as a whole or even his own nearly completely normal mental status examination of the claimant. Therefore, little weight was given to most of the functional limitations in his opinion, and significant weight was given to the aspects of his opinion that the claimant's immediate short-term memory and remote memory were intact; her intellectual functioning was estimated to be in the low average range and that she was expected to be able to understand and apply instructions and carry out work-related tasks in the workplace consistent with her level of intellectual functioning; she has the requisite intellectual capacity, judgment, and calculation skills to effectively manage her own funds; and she was best suited for repetitive tasks. As a whole, only partial weight was given to his opinion.

(R. 73-74).

## C.      Analysis

As the court's summary above suggests, the ALJ's decision is an unusually detailed and thorough decision. Plaintiff argues that "the reasons the ALJ offered for discounting Dr. Wells's opinions are not sufficient." (Pl. Br. 8). However, the question for the court's review is whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax, 489 F.3d at 1084; White, 287 F.3d at 905. The court finds they are, and he did.

The object of the court's review is the ALJ's decision, not Plaintiff's view of the decision, or what Plaintiff believes the evidence could support. Plaintiff must demonstrate the error in the ALJ's rationale or finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). Plaintiff's arguments address her characterization of the ALJ's decision and her view of a proper consideration of Dr. Wells's opinions, but not what the decision actually found regarding the opinions and whether substantial evidence ("such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") supports those findings.

Plaintiff's argument that the ALJ erred in finding Dr. Wells's opinions "inconsistent with 'nearly normal-to-normal' mental status examinations, including Dr. Wells's examination" (Pl. Br. 10, citing R. 73-74) ignores the primary emphasis of the ALJ's finding, that "the medical treatment records showed her mental status examinations were nearly normal-to-normal." (R. 73) (emphasis added). Although Plaintiff points to treatment records from The Guidance Center allegedly supporting Dr. Wells's opinions, as the Commissioner points out, those portions of the treatment records consist of Plaintiff's subjective allegations. (R. 525, 531, 534). However, as noted above, the ALJ provided a particularly extensive and detailed summary of Plaintiff's mental health treatment at The Guidance Center from October 2016 through November 2017, and he included discussion of Plaintiff's subjective reports at each of these treatment visits. (R. 61-64, citing Ex. 13F, pp. 1-3, 7-9, 10-11 (R. 525-27, 531-35)). Moreover, the Mental Status Examination (MSE) portion of each treatment record

supports the ALJ's finding that they were nearly normal-to normal. (R. 526, 532, 534-35).

Plaintiff's argument that her primary care physician, Dr. Gaul's treatment records are contrary to the ALJ's findings is also without merit. As Plaintiff suggests, Dr. Gaul stated Plaintiff "is on a very complicated regimen now from her Psychiatry Team in Atchison." (R. 521). But, Plaintiff does not acknowledge that in the very next sentence he went on to explain that "regimen." "Sertraline 150 mg daily, prazosin 1 mg daily, trazodone 50 mg at night, bupropion 300 mg daily and methylphenidate 5 mg daily." Id. Likewise, as Plaintiff also suggests, Dr. Gaul noted, "A lengthy discussion with her reviewing depression routine." (R. 523). However, once again Plaintiff fails to acknowledge the remainder of Dr. Gaul's discussion, "Again, a very difficult time with that of late and not making much headway it does not sound like, but she sees them next week and has room to push on the bupropion, and consideration to alternative adjunctive therapies but will leave that to the Psychiatry Team." Id. (emphasis added). None of these facts from Dr. Gaul's treatment records is contrary to the ALJ's findings or lends particular support to Dr. Wells's opinions. It certainly does not detract from the ALJ's finding of near normal mental status examinations. Of note is Dr. Gaul's suggestion that "alternative adjunctive therapies" might be considered, because throughout the decision the ALJ addresses and readdresses the fact that additional and alternative treatment modalities were suggested at different times and by different treatment providers but that Plaintiff repeatedly opposed such additional treatment.

Although Plaintiff seems to ignore the primary emphasis of this finding, it is also true that the ALJ found "contrary to Dr. Wells' opinion that the claimant was significantly limited, his own mental status examination was normal except that her mood was depressed." (R. 74). However, in context, the court cannot find error in this finding. The record reveals that the ALJ summarized and cited Plaintiff's reports of her subjective symptoms to Dr. Wells, both at the March 2016 and the September 2016 examinations. (R. 57-58, 63-64). Moreover, the ALJ explained how he had accommodated Dr. Wells's opinions in weighing Plaintiff's limitations in the four broad mental functional areas at step two and three of the sequential evaluation process (R. 57-58); he explained that he did not credit any sleep disturbance because at the second examination Plaintiff "acknowledged that when she took her sleep medication, she slept well" (R. 67); he explained how he had credited Dr. Wells's opinion when assessing limitations to simple instructions and simple, repetitive tasks (R. 70); and he explained the weight accorded to Dr. Wells's opinions. (R. 73-75). The ALJ acknowledged that Plaintiff had limitations in her mental abilities, and he explained how he had accommodated those limitations. Reading the decision as a whole leaves no doubt that the ALJ considered each of Dr. Wells's reports in its entirety. Considering this record together, as the court must, it sees no error in this regard.

Plaintiff's appeal to Bryant is likewise unavailing. Plaintiff's argument attempts to apply too broadly Bryant and the principle that an ALJ "may not 'pick and choose among medical records, using portions of evidence favorable to his position while ignoring other evidence,' or mischaracterize or downplay evidence to support her

findings." Bryant, 753 F. App'x at 641 (quoting Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004), and citing Talbot v. Heckler, 814 F.2d 1456, 1463-64 (10th Cir. 1987)). As the court found above, the ALJ did not improperly ignore, mischaracterize, or downplay Dr. Wells's opinions or the treatment records from The Guidance Center.

It is the ALJ's duty to weigh the evidence and the medical opinions. Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)). Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. §§ 404.1545(a), 416.945(a). Moreover, the final responsibility for determining RFC rests with the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946. That the ALJ credited certain portions of Dr. Wells's opinion and discounted others is not the error present in Bryant, it was his duty in weighing the opinions. That error would have been present if the ALJ had downplayed portions of the opinions without explanation or if he had ignored portions of the opinions or mischaracterized them in his decision. To find otherwise would be to remove the responsibility for RFC assessment from the Commissioner and his delegated decisionmaker, the ALJ, and to place it instead with a healthcare professional. Congress

16

certainly could have done that in the Act, but it did not.  Social Security disability

benefits are a statutory creation and the courts may not second-guess Congress's

decisions.  Although Plaintiff, or even this court, might disagree with the ALJ's

weighing, so long as substantial evidence ("such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion") supports the Commissioner's

decision, and so long as the Commissioner applied the correct legal standard, the court

must affirm his decision.

Plaintiff next argues that it was error for the ALJ to discount Dr. Wells's opinions

as "inconsistent with [Plaintiff]'s minimal mental health treatment, lack of suicidal

ideation, and reports that her last 'bout' of anxiety had been two months before the

examination," because Dr. Wells had considered each of these factors in formulating his

opinions.  (Pl Brief 13-14) (citing R. 73, and <u>Fuller v. Astrue</u>, 766 F. Supp. 2d 1149, 1162

(D. Kan. 2011) (finding that the ALJ substituted his medical judgment for that of the

medical source when the record made clear that the ALJ specifically considered the

claimant's pain behaviors when formulating their opinions)).  Once again, if an ALJ

could not discount a medical opinion based on a fact the psychologist had already

considered when formulating his opinion, that would be tantamount to taking away the

Commissioner's duty to weigh the medical opinion, and that is not what this court held in

<u>Fuller</u>.  In <u>Fuller</u>, the psychologists diagnosed the plaintiff with "pain disorder associated

with both psychological factors and a general medical condition" and with somatoform

disorder, and the ALJ found that each disorder was one of the plaintiff's severe mental

impairments.  766 F. Supp. 2d at 1161.  The court explained those two disorders as

described in the Diagnostic and Statistical Manual of Mental Disorders:

> In summarizing the diagnostic features of somatization disorder, the Diagnostic and Statistical Manual of Mental Disorders states, "The essential feature of Somatization Disorder is a pattern of recurring, multiple, clinically significant somatic complaints." It explains that, "The multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance."  It concludes, "Finally, the unexplained symptoms in Somatization Disorder are not intentionally feigned or produced (as in Factitious Disorder or Malingering)."

> The Manual also states, "The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention."  It notes that, "Psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain" and "The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering."  In "Pain Disorder Associated with Both Psychological Factors and a General Medical Condition," "both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain," and "The symptom or deficit is not intentionally produced or feigned (as in Factitious Disorder or Malingering)."

Fuller, 766 F. Supp. 2d at 1161–62 (citations omitted, emphases added by the Fuller

court).  It was in this context that this court found in Fuller that

> the ALJ's statement that he gave "little weight" to portions of the doctors' opinions because of the symptom magnification and pain exaggeration ignores the fact that the doctors specifically considered those pain behaviors.  In the circumstances, this amounts to no more than "picking and choosing" only those parts of the reports which are favorable to his determination.  In according substantial weight to the first portion of the doctors' opinions, but only little weight to the linked second portion of the opinions, the ALJ was substituting his medical judgment for that of the medical source, and that is something he may not do. Winfrey v. Chater, 92 F.3d 1017, 1022–23 (10th Cir. 1996) (ALJ erred in substituting his medical judgment for that of a medical professional); see also, McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative

inferences from medical reports and may reject a treating physician's
opinion outright only on the basis of contradictory medical evidence and
<u>not due to his or her own credibility judgments, speculation or lay
opinion</u>.") (citation omitted) (emphasis in <u>McGoffin</u>).

<u>Fuller</u>, 766 F. Supp. 2d at 1162.  Here, Plaintiff's "minimal mental health treatment, lack

of suicidal ideation, and reports that her last 'bout' of anxiety had been two months

before the examination" are not bound up with Dr. Wells's diagnoses of, and the ALJ's

finding of, severe mental impairments as were the symptom magnification and pain

exaggeration in <u>Fuller</u>.  Therefore, the ALJ here did not substitute his medical judgment

for that of Dr. Wells, but he fulfilled his duty to weigh Dr. Wells's opinions, and he

explained his bases for crediting and discounting certain aspects of those opinions.

Plaintiff's arguments, that "Dr. Wells did not base his opinion on a claim of

suicidal ideation and noted in both examinations that [Plaintiff] had not been suicidal

since 2015," and that Plaintiff "did not report in the March 2016 examination that she last

had a 'bout' of anxiety two months earlier, but instead reported that she would 'worry

about everything, constantly' and she found it 'hard to control her worry'" (Pl. Br. 14)

misunderstand the reasons the ALJ gave to discount Dr. Wells's opinion.  The ALJ stated

that only three portions of Dr. Wells's opinions related to functional limitations are well-

supported by the record, but that "the remainder of [Dr. Wells] opinion was more limiting

than suggested in the medical treatment records, the minimal mental health treatment the

claimant accepted, that she did not report a significant symptom of suicidal ideation since

December 2015, and her last "bout" of anxiety or panic attack had occurred about two

months earlier."  (R. 73).  The ALJ did not find that Dr. Wells based his opinion on

suicidal ideation, but rather that the fact Plaintiff had had no suicidal ideation since 2015 was <u>one factor, among several</u>, that suggested Plaintiff's limitations were not as severe as Dr. Wells opined. The ALJ's reliance upon the fact of no "bout" of anxiety or panic attack in two months is to the same effect. Moreover, it is instructive to read each of the ALJ's discussions of "panic attacks," "anxiety," "spells," or "bouts" throughout the decision. (R. 56, 59, 60, 61, 62, 63, 64, 65, 66, 68, 70, 71, 72, 73, 75). The ALJ did not err to use these facts to discount a portion of Dr. Wells's opinions.

Finally, Plaintiff's argument that the ALJ erred by using Plaintiff's refusal of additional mental health treatment to discount Dr. Wells's opinions without engaging in the <u>Frey</u> analysis is not persuasive either. As Plaintiff's argument suggests, the Tenth Circuit held in <u>Frey</u>, based upon 20 C.F.R. § 404.1530, "In reviewing the impact of a claimant's failure to undertake treatment on a determination of disability, [the court] consider[s] four elements: (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." <u>Frey</u>, 816 F.2d at 517.

Although Plaintiff argues that the ALJ erred in failing to apply the <u>Frey</u> analysis, she does not argue that application of the analysis would demonstrate that her refusal of treatment was justifiable. Thus, any error in failing to apply the analysis may be harmless. Moreover, it is not at all clear that the ALJ did not apply the appropriate analysis.

In his summary of the record evidence, the ALJ noted that Plaintiff declined numerous recommendations to engage in adjunctive therapies, regular exercise, multi-modal mental health treatment, increase physical activity, improve her diet, and see a neurologist for her alleged memory problems, and there is no evidence she implemented any of these recommendations. (R. 61, 62, 64, 65, 66, 68, 70) (citing Exs. 12F, 13F/4-6, 7-9, 10-11). The record cited by the ALJ supports his findings, and in fact, Dr. Wells's report of his second examination supports these findings of the ALJ. Dr. Wells noted Plaintiff "denied any other treatment (individual or group therapy experiences). I asked her about her openness to engage in individual therapy at this time. She adamantly denied wanting to do this. She stressed, 'No. I don't care to do that.'" (R. 467).

Plaintiff provided no excuse for declining to take these recommendations, and as the ALJ noted there is no record evidence Plaintiff attempted any of the recommendations. Moreover, the ALJ specifically discussed the failure to follow such recommendations in the context of Plaintiff's prescribed sleep aids:

> Although the claimant persistently alleged sleep disturbance, at the second consultative examination with Dr. Wells, she acknowledged that when she took her sleep medication, she slept well and, when she did not take her sleep medication, she did not sleep well. (Exhibit 8F/5). Therefore, this statement indicated the claimant had a choice to sleep well or not, by simply complying with her prescribed medication regimen or not. (Exhibit 8F/5). As the claimant had access to her prescription sleep aide, the record does not support a finding the claimant had any significant financial barrier to compliance. The record also does not document bothersome side effects from this medication, or the claimant having an impairment-related obstacle to understanding the need for, and the efficacy of, this treatment. In addition, most medical notes did not contain descriptions of the claimant appearing tired; instead, she was generally described as alert and oriented. (See, Exhibit 13F).

(R. 67).  While it is true that the ALJ might have addressed more of the treatment modalities or recommendations at issue and might have expressly considered more potential excuses for declining the treatments, in the absence of any argument by Plaintiff before the ALJ (or even before this court) that she has a justifiable excuse for not following the recommendations, the court can find no error in the ALJ's evaluation.

The court believes it goes without saying (but nonetheless says) that the ALJ was not required to consider whether the treatment at issue would restore Plaintiff's ability to work, because there has never been a finding in this case that without the treatment Plaintiff cannot work.  Additionally, and significantly, it is worth noting that the ALJ did not rely on his finding that Plaintiff declined recommended treatment in order to discount Plaintiff's allegations of symptoms or in order to deny Plaintiff's disability for failure to follow prescribed treatment, but as one among several factors in finding that Dr. Wells's opinions "are much more limiting than the medical treatment record would generally indicate."  (R. 73).

Plaintiff has shown no error in the decision at issue.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated August 21, 2019, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**

22